IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

REGIS J. STOHL,

      **Plaintiff,**

v.                                           Civil Action No. 1:14cv109
                                           (Judge Keeley)

EASTERN REGIONAL JAIL; C.O. PAGE;
C.O. VANORSDALE; C.O. ATHEY; C.O.
HOLLOWAY;[1] C.O. WOLFE; C.O. MILLER;
C.O. SIMMONS; C.O. RICE; C.O. SMITH; and
SGT. GRONA,

      **Defendants.**

## REPORT AND RECOMMENDATION

### I.  Introduction

On June 13, 2014, the *pro se* plaintiff, an inmate formerly incarcerated at the Eastern Regional Jail ("ERJ")[2] in Martinsburg, West Virginia, filed a civil rights complaint pursuant to 42 U.S.C. §1983 in the Southern District of West Virginia.  On June 23, 2014, the case was transferred to this district.  The Clerk of Court issued a Notice of Deficiency.  On July 16, 2014, the plaintiff corrected his deficient pleadings and by Order entered the following day, was granted permission to proceed *in forma pauperis* ("IFP") but directed to pay an initial partial filing fee.  Plaintiff paid the requisite fee on August 4, 2014.  On August 6, 2014, the Court performed a preliminary review of the case, determined that summary dismissal was not appropriate, and ordered the Defendants to answer.[3]

---

[1] It appears from the record that "C.O. Holloway" is actually Sgt. Holloway, and she will be referred to as thus herein.

[2] The plaintiff is now incarcerated at the Parkersburg Correctional Center in Parkersburg, West Virginia.

[3] Plaintiff has also filed four motions for court-appointed counsel; they were denied by Orders entered July17, July 29, September 2, and September 15, 2014.

On September 4, 2014, in lieu of an answer, the Defendants filed a motion to dismiss and for summary judgment. Because the plaintiff was proceeding *pro se*, on September 8, 2014, the Court issued a <u>Roseboro</u>[4] Notice, advising him of his right to respond to the defendants' dispositive motion. On September 29, 2014, plaintiff filed his response, a Motion to Amend the Complaint, and a copy of a certificate of service, evincing service of his first request for production of documents to the defendants ("RPOD"). By separate Orders entered September 30, 2014, the plaintiff's motion to amend was granted, and his first RPOD was struck as premature; discovery was stayed and the defendants were directed to disregard the RPOD.

On October 9, 2014, the plaintiff filed his amended complaint, adding several new defendants and elaborating on the claims already made. By Order entered October 27, 2014, the defendants were directed to answer the amended complaint. On November 25, 2014, the defendants filed a Motion to Dismiss Plaintiff's Amended Complaint and Motion for Summary Judgment. The undersigned issued a second <u>Roseboro</u> Notice on October 1, 2014. The Notice was sent by certified mail, return receipt requested. A review of the docket reveals that the Notice was returned as undeliverable on October 10, 2014. By Order entered on January 13, 2015, the plaintiff was directed to show cause why his case should not be dismissed for failure to prosecute. On January 30, 2015, the plaintiff filed a notice of change of address with the court; a response to the Show Cause Order; and a response to the defendants' second dispositive motion. On February 13, 2015, the defendants replied.

This case is before the undersigned for a report and recommendation pursuant to 28 U.S.C. §1915 and LR PL P 2.

## II. <u>The Pleadings</u>

### A. <u>The Complaint</u>

---

[4] <u>Roseboro v. Garrison</u>, 528 F.2d 309, 310 (4th Cir. 1975).

In the amended complaint, the plaintiff alleges that the defendants violated his Eighth and Fourteenth Amendment rights as a pretrial detainee by subjecting him to excessive force; failing to protect him; being deliberately indifferent to his serious medical needs; and by retaliating against him. Further, plaintiff raises a conditions of confinement claim.

Plaintiff alleges that on January 20, 2013, while a pre-trial detainee at the Eastern Regional Jail ("ERJ"), he was denied basic hygiene, including showers, exercise and access to a telephone for either "several days"[5] or "over a week."[6] At approximately 8:15 a.m. on the day in question, C.O. Wolfe, who was not assigned to the tower that day,[7] went to the tower, opened plaintiff's and several other inmates' cell doors and then immediately closed them, saying "you refuse your hygiene" and then laughed. After plaintiff protested and stated "Officer Rice[8] did not refuse my hygiene," Wolfe laughed and started to shake the sliding door to plaintiff's cell.[9] Around 11:30 a.m., as plaintiff was complaining about his hygiene hour to C.O. Holloway, who had come into the unit, C.O. Rice came on the intercom in his cell and threatened plaintiff with a write-up for obstruction and more segregation time if he complained any further. Plaintiff admits he used the "wrong choice of words" by asking C.O. Rice "[w]hy are you being such a bitch?"[10] He contends that in response, C.O. Rice stated "I got something for your ass[.]"[11] Approximately 45 minutes later at around 12:30 p.m., while plaintiff was lying on his bunk reading, Sgt. Grona and numerous C.O.s dressed in full riot

---

[5] Dkt.# 8 at 11 and Dkt.# 45-1 at 1.

[6] Dkt.# 45 at 8.

[7] Dkt.# 8 at 11.

[8] Sgt. Holloway was the designated supervisor for the 7 a.m. – 7 p.m. shift on January 20, 2013. See Dkt.# 31-8 at 1. Rice was assigned to the Alpha Pod for the 7 a.m. – 7 p.m. shift that day. Dkt.# 31-6 at 5. Rice was working in the tower that day. Dkt.# 45-1, ¶4 at 1.

[9] Dkt.# 45-1 at 1.

[10] Dkt.# 45-1,¶10 at 1.

[11] Dkt.# 45-1, ¶11 at 1.

gear appeared at his cell. Grona ordered him to lie down on the floor; plaintiff contends that he complied without resisting. He avers that then without provocation, C.O. Wolfe entered, leaped on his back, and Wolfe and other C.O.'s then assaulted him, kicking, kneeing, and beating him both before and after he was handcuffed, shackled, and not resisting, injuring his right arm, lower back, ribs and face.[12] Plaintiff states that he cannot identify all the officers who were involved because they wore masks and gear, but that C.O.s Wolfe, Simmons, Miller, Rice, and Sgts. Grona and Holloway participated, and Cpl. Smith videotaped the incident, but failed to keep the camera on him according to policy.[13]

Plaintiff further contends that after the assault while being escorted to intake/control in handcuffs and shackles, the C.O.s deliberately rammed his right shoulder into the steel doorframe of the second door leading to the hall from Unit A-7, "to inflict more pain." Upon arrival at intake/control, photos were taken of his injuries.[14] An unknown nurse asked if he was hurt or in pain; plaintiff contends that he reported to the nurse that something was wrong with his right arm, and that his right arm and back both hurt very badly. Despite this, he contends he was escorted back to Unit A-7 without receiving any medical treatment. Upon arrival back at his cell at approximately 1:30 p.m., plaintiff contends that the C.O.s slammed him onto his concrete bunk and assaulted him again.

---

[12] In his original complaint, plaintiff contends that "C.O. Wolf [sic], [sic] jumped on my back and arm and other guards kneed me, while I was handcuffed and shackled." Dkt.# 1 at 4. In his original court-approved form complaint, plaintiff alleges that one C.O. "jumped on my right arm causing damage to my elbow." Dkt.# 8 at 11.

[13] In his original complaint, plaintiff alleges that inmates Chris Moore and Jeremy Davis witnessed the incident. Dkt.# 1 at 5.

[14] In his original court-approved form complaint, plaintiff asserts that "they took pictures in booking" before asking him if he was hurt. Dkt.# 8 at 11. The photographs, two pictures of the front of plaintiff's stomach and lower chest area with his T-shirt partially-lifted up, and a photo of each arm, are dark, of poor quality, and provide little evidentiary value. There is no visible rib injury in the limited portions of rib areas shown, but the sides and back rib areas are not depicted. The picture of the right arm is so dark that the view of the wrist is obscured. Further, the photo only depicts the outer surface of the right elbow. While it is difficult to determine whether there is any swelling there, the record indicates that the large hematoma that later developed was in the inner, antecubital area, not on the outer surface of the elbow. The left arm elbow is obscured by large tattoos over the elbow and on the inner antecubital surface, and the wrist is barely visible due to the darkness of the photo.

Plaintiff contends that after repeatedly pressing his intercom to ask for medical assistance, C.O. Rice threatened to send the "the extraction officers" back again if he asked any further. Out of fear for his safety, plaintiff stopped asking. He avers that he was denied medical care for 6-7 hours, until at approximately 7:30 p.m., when a nurse on the next shift named Jess saw his bruises and the "massive hematoma" on his right arm and immediately arranged for him to be transported to the Martinsburg Health Center Emergency Room. Even then, plaintiff contends he still had to wait at the ERJ for several more hours before actually being transported to the emergency room ("E.R.") at around 10 p.m. by C.O. Wade and C.O. Cole. Plaintiff avers that at the E.R., x-rays were taken of his right arm and lower back and he finally received pain medication. Plaintiff avers that his injuries from the blunt force trauma were bruising on his ribs and face, lower back damage, and a softball-sized hemtatoma on his right elbow.[15]

Plaintiff avers that several days after the assaults, he was transferred to Unit A-6, a different segregation unit. Approximately a week later, plaintiff was taken to medical and advised by staff there that he needed to have his right arm cut open "to remove the flesh that was starting to calciumize [sic]."[16] Plaintiff states he was unwilling to proceed, but was told "you don't have a choice." After taking x-rays of the arm with the hematoma, a one and a half-inch incision was made and the wound evacuated. After "removing the flesh," the wound was packed with gauze. Plaintiff avers that C.O. Sullivan was present and witnessed the procedure, and asked plaintiff what happened; plaintiff advised that "the officers here did it."[17]

---

[15] In his original court-approved form complaint, plaintiff alleges that after he was brought back from the E.R., Mr. Sheely, the jail administrator, came to visit him and apologized for the officers' actions. Further, a Sgt. Tate was called in, and he told plaintiff "they cant [sic] just come beat . . . [you] up while in segregation when [you're] . . . no danger to anyone or . . . [yourself] . . . [I have] never seen it and [you] should have been transported and medical issues adressed [sic] by the previous shift way earlier in the day not 6 to 7 hours later." Dkt.# 8 at 11.

[16] Dkt.# 45-1 at 5.

[17] Dkt.# 45-1, ¶60 at 5.

Afterwards, C.O. Vanorsdale escorted plaintiff back to the segregation unit. The officers in the segregation unit control tower at the time were C.O.s Page and Athey. When plaintiff arrived with Vanorsdale, a convicted D.O.C. inmate, "Bill Cardell [sic],"[18] was out of his cell, "exercising and free to move about" in the unit. Plaintiff alleges that Vanorsdale left plaintiff there, handcuffed, shackled, and with a wounded arm, and left the unit. Plaintiff contends that this was in direct contravention of policy forbidding segregation inmates to be out of their cells in contact with any another inmate in segregation, let alone for pretrial detainees to be mingling with convicted D.O.C. inmates.[19] Inmate Caudill ran up to plaintiff and punched him repeatedly in the side of his head while plaintiff was unable to defend himself, causing bleeding from plaintiff's left ear. After the assault, inmate Caudill ran back into his cell and C.O.s Page and Athey closed Caudill's sliding door via the A-pod tower. C.O. Vanorsdale returned to the unit and removed plaintiff's cuffs and shackles and put him in his cell. C.O. Athey stated over the intercom to C.O. Vanorsdale "man did you see that" and laughed.[20]

Plaintiff further alleges that when Corporal Vorhart learned of the assault, he made plaintiff fill out a report about what had happened, and C.O. Wolfe charged Inmate Caudill with a disciplinary action over the assault. After Vorhart filed an incident report, a nurse cleaned the blood out of plaintiff's left ear and put cotton in it.

Plaintiff states he was then moved to segregation unit A-7, where despite ERJ medical staff's awareness of his open wounds, they were deliberately indifferent to his serious medical needs and he received no further treatment for his injuries. Eventually he removed the packing from his own arm

---

[18] Apparently, the inmate's name is Willis Caudill, not Bill Cardell. See Dkt.# 31-9 at 1. Caudill will be referred to hereinafter by his true name.

[19] Dkt.# 45-1 at 5 – 6; see also Dkt.# 8 at 11.

[20] Dkt.# 45-1 at 6.

and tended the wound himself, using a bandage made from a bed sheet, developing an infection in the incision as a result.[21]

Plaintiff alleges that both before and after the January 20, 2013 assaults, he was denied access to basic hygiene, including showers, was denied exercise, and was not permitted to use the phone, and was therefore unable to call his lawyer.

Plaintiff alleges that the defendants deliberately harmed him, denied his basic needs and used excessive force against him in retaliation for his using the word "bitch" when complaining to C.O. Rice about the denial of hygiene.[22]

Plaintiff contends that he has permanent injuries to his arm and lower back.[23] He avers that he has fully exhausted his claims.

Finally, he attaches a copy of a September 25, 2013 letter from one Missy Hicks, West Virginia Regional Jail Authority ("WVRJA") Internal Affairs Investigator, which appears to give credence to his version of the events.[24]

As relief, plaintiff seeks injunctive relief in the form of an Order directing that the officers who assaulted him be criminally charged and removed from their jobs. He also seeks compensatory damages to cover medical expenses incurred for treatment of his injuries. Further, he requests an award of $100,000.00 from each defendant, "totaling [sic] $1,000,000."[25]

## B. **Defendants' Motion to Dismiss or for Summary Judgment**

---

[21] Dkt.# 45-1, ¶¶75 - 77 at 6.

[22] Dkt.# 45-1, *passim.* In his original court-approved form complaint, plaintiff contends that during the remainder of his time at the ERJ, he was fearful for his safety in the presence of the involved officers; that they knew he feared them and "used that and taunted" him." Dkt.# 8 at 12. Plaintiff states he was incarcerated at the ERJ from October, 2012, until February, 2014. See Dkt.# 8 at 11.

[23] Plaintiff states that he has copies of medical records, obtained by family; however, he did not produce them.

[24] Dkt.# 45-1 at 7.

[25] Dkt.# 45 at 9.

The Defendants contend that the complaint should be dismissed, or summary judgment granted in their favor because:

1) plaintiff failed to provide pre-suit notice in compliance with W.Va. Code §55-17-3, a jurisdictional requirement for filing suit against a State agency;

2) plaintiff did not properly and timely exhaust his administrative remedies;

3) the Eastern Regional Jail and the WVRJA[26] are not proper parties; and

4) Sgts. Grona and Holloway, and C.O.s Simmons, Wolfe, Rice, Smith, Miller, Vanorsdale, Page and Athey are all entitled to qualified immunity.

## C. **Plaintiff's Response**

The plaintiff reiterates his claims and requests that his case not be dismissed.

## D. **Defendants' Reply**

Defendants reiterate their previous arguments but withdraw their motion to dismiss as to the argument that plaintiff failed to comply with W.Va. Code §55-17-3, acknowledging that that provision applies only to action against State agencies filed in state courts.

## III. **Standard of Review**

### A. **Motion to Dismiss**

In ruling on a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court must accept as true all well-pleaded material factual allegations. Advanced Health-Care Services, Inc. v. Radford Community Hosp., 910 F.2d 139, 143 (4th Cir. 1990). Moreover, the Federal Rules of Civil Procedure "require[ ] only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)). However, although a complaint need not assert "detailed factual allegations," it must contain "more than labels and conclusions" or "a formulaic recitation of the

---

[26] Nowhere has the plaintiff named the WVRJA as a defendant.

elements of a cause of action." <u>Twombly</u>, 550 U.S. at 555 (citations omitted). To survive dismissal for failure to state a claim, the complaint must raise a right to relief that is more than speculative. *Id*. In other words, the complaint must contain allegations that are "plausible" on their face, rather than merely "conceivable." <u>Id</u>. at 555, 570. A "claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Ashcroft v. Iqbal</u>, 129 S.Ct. 1937, 1949 (2009).

When a motion to dismiss pursuant to Rule 12(b)(6) is accompanied by affidavits, exhibits and other documents to be considered by the Court, the motion will be construed as a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure.

**B.  <u>Motion for Summary Judgment</u>**

Under the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admission on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed.R.Civ.P. 56(c).  In applying the standard for summary judgment, the Court must review all the evidence "in the light most favorable to the nonmoving party."  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).   The Court must avoid weighing the evidence or determining the truth and limit its inquiry solely to a determination of whether genuine issues of triable fact exist.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

In <u>Celotex</u>, the Supreme Court held that the moving party bears the initial burden of informing the Court of the basis for the motion and of establishing the nonexistence of genuine issues of fact.  <u>Celotex</u> at 323.  Once "the moving party has carried its burden under Rule 56, the opponent must do more than simply show that there is some metaphysical doubt as to material facts." <u>Matsushita Electric Industrial Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986).  The nonmoving party must present specific facts showing the existence of a genuine issue for trial.  <u>Id.</u>  This means that the "party opposing a properly supported motion for summary judgment may not rest upon mere

allegations or denials of [the] pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." Anderson at 256. The "mere existence of a scintilla of evidence" favoring the non-moving party will not prevent the entry of summary judgment. Id. at 248. Summary judgment is proper only "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." Matsushita, at 587 (citation omitted).

## IV. Analysis

### A. The Eastern Regional Jail

42 U.S.C. §1983 provides as follows:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

Therefore, in order to state a claim under 42 U.S.C. §1983, the plaintiff must demonstrate that a person acting under color of state law deprived him of the rights guaranteed by the Constitution or federal laws. Rendall-Baker v. Kohn, 547 U.S. 830, 838 (1982)

In the instant case, in addition to the other named defendants, the plaintiff names the Eastern Regional Jail ("ERJ") of Martinsburg, WV as a defendant. The ERJ is not a proper defendant because it is not a person subject to suit under 42 U.S.C. §1983. See Preval v. Reno, 203 F.3d 821 (4th Cir. 2000) (unpublished) ("[T]he Piedmont Regional Jail is not a 'person,' and therefore not amendable to suit under 42 U.S.C. §1983); and Brooks v. Pembroke City Jail, 722 F.Supp. 1294, 1301 (E.D.N.C. 1989) ("Claims under § 1983 are directed at 'persons' and the jail is not a person amenable to suit."); Will v. Mich. Dep't of State Police, 491 U.S. 58 (1989) (Neither a state nor its officials acting in their official capacities are "persons" under 42 U.S.C. §1983). This rule applies "to

States or governmental entities that are considered 'arms of the State' for Eleventh Amendment purposes." Id. at 70.  Accordingly, the ERJ should be dismissed from this action.

## B. Compliance with West Virginia Code § 55-17-3

Because the defendants have withdrawn their earlier argument that the complaint should be dismissed because the plaintiff failed to comply with West Virginia Code §55-17-3, the undersigned will not address this issue, beyond noting that such a requirement would only apply here if the court's jurisdiction was based upon diversity of the parties. However, it is not applicable in cases such as this that are before the court on the federal question presented. Succinctly put, "[a] state legislature has no authority to determine whether or how an action may proceed under federal law." Cunningham v. West Virginia, 6:06-cv-169, 2007 WL 895866, *5 (S.D. W.Va. Mar. 22, 2007). Accordingly, the undersigned will turn to the remaining grounds.

## C. Exhaustion under §1997e

Under the Prison Litigation Reform Act of 1995 (PLRA), as amended, prisoners must exhaust the grievance procedure in the institution where they are incarcerated prior to filing suit in federal court challenging prison conditions. 42 U.S.C.A. §1997e(a). In Jones v. Bock, the United States Supreme Court held that "failure to exhaust is an affirmative defense under the PLRA, and that inmates are not required to specially plead or demonstrate exhaustion in their complaints," nor do they have the burden of proving it. 549 U.S. 199, 216 (2007); see also Moore v. Bennette, 517 F.3d 717, 725 (4th Cir. 2008).[27]  Further, the Court has held that "proper exhaustion" is required, meaning that the inmate must follow the prison's administrative rules as required, including when and how to file the complaint. See Woodford v. Ngo, 548 U.S. 81 (2006).

Despite the fact that the Supreme Court has stated that it "will not read futility or other exceptions into statutory exhaustion requirements," Booth v. Churner, 532 U.S. 731, 741, n.6 (2001),

---

[27] A district court may also raise the affirmative defense of exhaustion *sua sponte*, so long as the Plaintiff is given an opportunity to respond. See Anderson v. XYZ Corr. Health Svcs., Inc., 407 F.3d 674 (4th Cir. 2005).

several courts have found that the mandatory exhaustion requirement may be excused in certain limited circumstances. See Ziemba v. Wezner, 366 F.3d 161, 163 (2nd Cir. 2004) (defendant may be estopped from asserting exhaustion as a defense when defendant's actions render grievance procedure unavailable); Mitchell v. Horn, 318 F.3d 523, 529 (3rd Cir. 2003) (summary dismissal for failure to exhaust not appropriate where prisoner was denied forms necessary to complete administrative exhaustion); Miller v. Norris, 247 F.3d 736, 740 (8th Cir. 2001) (remedy not available within meaning of § 1997e(a) when prison officials prevent a prisoner from utilizing such remedy); Aceves v. Swanson, 75 F. App'x 295, 296 (5th Cir. 2003) (remedies are effectively unavailable where prison officials refuse to give inmate grievance forms upon request). Indeed, the Fourth Circuit has held that "an administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it." Moore v. Bennette, 517 F.3d 717, 725 (4th Cir. 2008).

The West Virginia Jail and Correctional Facility Authority's *Handbook of Inmate Rules and Procedures*[28] sets forth the following five step process for grievances:

1. If an inmate wishes to use the grievance procedure, jail personnel will provide the inmate with an inmate with an inmate grievance form.

2. The inmate shall complete the form, addressed to the Administrator; the form, as completed by the inmate, shall be transmitted to the Administrator's office by jail personnel without being read or altered and within a reasonable time, not later than the end of the shift.

3. The Administrator upon receipt of the grievance may reject the grievance if it appears on its face to have been filed in bad faith.

4. The Administrator, if the grievance is not rejected pursuant to Paragraph 3, shall provide the inmate an opportunity to be heard before a decision is made on the grievance. The Administrator may assign a staff member to investigate the complaint and report written findings within forty-eight hours and shall inform the inmate of such action.

5. The Administrator shall provide a written decision with regard to the grievance to the grieving inmate within twenty-four (24) hours of the receipt of the

---

[28] Available at: http://apps.sos.wv.gov/adlaw/csr/readfile.aspx?DocId=18978&Format=PDF

investigation report. Such written decision shall include a statement of the action taken concerning the grievance, the reasons for such action, and procedures for appeal of the decision.

Further, if an inmate is dissatisfied with the Administrator's decision, he must file an appeal to the Executive Director within five days of the receipt of the Administrator's decision, and must include a copy of the initial complaint and the Administrator's decision.

Although it is not the plaintiff's burden to plead exhaustion, the §1983 form complaint of this Court that is given to inmates asks if the inmate followed the grievance procedure, and directs them to attach copies of their grievances and responses. Here, although plaintiff did not attach copies, in his original complaint, he avers that he "[w]rote a grievance at ERJ no response, then wrote a letter to Regional Jail Authority."[29] In his court-approved form complaint, plaintiff avers that he "wrote multiple grievances that were unanswered and sent a letter to West Virginia Regional Jail and Correctional Facility Authority."[30] In his amended court-approved form complaint, again without providing dates on which he did so, he alleges that he filed Level 1 and Level 2 grievances to which he received no response, because they were "discarded by staff," before writing to the WVRJA on an unspecified date.[31]

Plaintiff attaches a copy of the WVRJA's September 25, 2013 response letter, written by Missy Hicks, the WVRJA's Internal Affairs Investigator, which states in pertinent part:

> I am writing in receipt of your correspondence to the [WVRJA] . . . which was forwarded to my office for review and response. **Your claim of being assaulted by the riot squad and refusal of medical care was reviewed. Upon completion of this review, issues were identified in regards to your handling process. These issues were immediately addressed by Mr. Sheely, Administrator and appropriate action was taken in regards to the Correctional Officers involved**. As per your request to be removed from lock down, this request will be forwarded to Administrator Sheely for review and decision.

---

[29] Dkt.# 1 at 2.

[30] Dkt.# 8 at 6.

[31] Dkt.# 45 at 5.

(Dkt.# 45-1 at 7)(emphasis added).

In support of their burden, defendants argue that plaintiff did not follow the proper procedure, because he failed to exhaust his Level 1 and Level 2 grievance steps before contacting the WVRJA,[32] a move they say that that subverts the 3-level administrative process. Defendants' second dispositive motion attaches an affidavit from D.E. "Gene" Bittinger, Captain of the ERJ, asserting that contrary to plaintiff's claim that he submitted Level 1 and 2 grievances which were discarded by staff, so he did not get responses, plaintiff never submitted them at all.[33] Further, they aver that the ERJ's grievance process is designed to be tamper-proof, because the ERJ provides inmates with grievance forms, and once an inmate fills out the form, the grievance can then be placed in one of the locked mailboxes present on each unit, to be removed by office staff and delivered to the appropriate person for processing. Finally, they argue that even if plaintiff's letter to the WVRJA is construed as a valid step in the administrative process, the letter does not address all of plaintiff's claims. Specifically, they argue that the letter does not mention the later assault by inmate Caudill; the denial of telephone access to plaintiff's attorney; and the failure to provide follow-up medical attention for the arm injury.

The plaintiff's February 4, 2013 letter to the WVRJA states in pertinent part:

I am writing you in regaurds [sic] to an incident that occured [sic] in your jail. I was sent to A-7 cell 5 solitare [sic] lockdown for a [sic] incident involving a spoon . . . While in lockdown A7-5 they didn't give me my hour 2 days in a row n [sic] on the 3rd day C.O. Holloway [sic] and C.O. Rice was in the tower. At approximatly [sic] 7:40 C.O. Wolf [sic] came on the intercoms said hygiene the [sic] quickly said u refuse [sic] before any of us could speak. So thats [sic] 3 days in a row. I was "hoping" that it was a joke but it wasn't I did argue with C.O. Rice then spoke with Holoway [sic] when he was serving chow. Rice came on the Intercom when me n [sic] Holoway [sic] were speaking of my hour. Rice said leave him alone before I write u [sic] up for Obstruction n [sic] I said get off the box while Im [sic] speaking

[32] Defendants attach a copy of plaintiff's February 4, 2013 letter to the WVRJA to their dispositive motion filed in response to the amended complaint. See Dkt. 58-4.

[33] Dkt.# 58-2, ¶¶4 – 5, at 1 – 2.

to Holoway [sic] n [sic] covered it n [sic] she got mad n [sic] said I got somthing [sic] for you n [sic] laughed then the Riot squad came n [sic] beat me up at 12:30 n [sic] refused me health care n [sic] then about 8 hours later a new shift n [sic] nurse immediately [sic] took me to the hospital for XRays [sic] of my arm n [sic] back then stuck me imediatley [sic] back in lockdown with no healthcare n [sic] added 30 more days 60 altogether I [sic] have staff willing to testify. Action needs to be taken immediatly [sic], this jail is corrupt n [sic] most off [sic] the staff is also . . . No matter what was said I was not a threat to anybody n [sic] was not kicking my door there was no need to etract [sic] me . . . beat me up take [sic] me up the hall n [sic] take me right back with no medical treatment when asked until [sic] it was not ignored n [sic] immediatly [sic] recognized by the next shift would like to be released from lockdown immedialtly [sic]. thank you.

Dkt.# 58-4 at 1 – 2.

In response to defendants' second dispositive motion, plaintiff only reiterates his claims and asks that the court not dismiss his case.

In their reply to plaintiff's <u>Roseboro</u> response, defendants contend that plaintiff "variously claims that he received no response to his Level 1 and 2 grievances and that those grievances were "discarded" by unidentified officers." Further, they point out that despite plaintiff's "conclusory claims of obstruction with or alternatively, the non-responsiveness of the ERJ officials to his grievances, the Plaintiff was successful in sending a letter of complaint to the WVRJA."[34] They argue that plaintiff's claims regarding his attempts to exhaust are "vague and inconsistent" but "plainly reveal that he did not follow the WVRJA grievance process." Further, they note, that despite having an opportunity to respond to their arguments on the point, the plaintiff "made no effort" to contest the defendants' allegations regarding his failure to exhaust.

Section 1997e(a) provides that prisoners are required to exhaust "such administrative remedies as are available," and courts have consistently held that "administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it." <u>Moore</u>, 517 F.3d at 725. Further, courts are "obligated to ensure that any defects in exhaustion were not procured from the action or inaction of prison officials." <u>Aquilar-</u>

[34] Dkt.# 77 at 3.

Allevaleda v. Terrell, 478 F.3d 1223, 1225 (10th Cir. 2007); see also Kaba v. Stepp, 458 F.3d 678, 684 (7th Cir. 2006) ("[W]hen prison officials fail to provide inmates with the forms necessary to file an administrative grievance, administrative remedies are not 'available.'") (citations omitted); Brown v. Croak, 312 F.3d 109, 111-12 (3rd Cir. 2002), (holding that administrative remedies were unavailable where the prison officials erroneously told the prisoner that he must wait until the investigation was complete before filing a grievance).

The West Virginia statute pertaining to the requirement that prisoners exhaust remedies is found at West Virginia Code §25-1A-2(a), which provides as follows:

> (a) An inmate may not bring a civil action until the administrative remedies promulgated by the facility have been exhausted; *Provided*, That the remedies promulgated by the facility will be deemed completed within sixty days from the date the inmate filed his or her initial complaint if the inmate fully complied with the requirements for filing and appealing the administrative complaint.

The Code also requires the Commissioner of the Division of Corrections and the Executive Direction of the Regional Jail Authority to establish administrative procedures for processing prisoners' complaints about the conditions of their confinement. W. Va. Code §25-1A-2(b).

However, West Virginia Code §25-1A-2(c) states:

> (c) Notwithstanding any other provision of this code, **no inmate shall be prevented from . . . bringing a civil or criminal action alleging past, current or imminent physical** *or sexual* **abuse**; if such a civil or criminal action is ultimately dismissed by a judge as frivolous, then the inmate shall pay the filing costs associated with the civil or criminal action as provided for in this article.

W.Va. Code §25-1A-2(c)(emphasis added).

Here, because plaintiff's complaint alleges physical attacks by correctional officers on January 20, 2013, and by inmate Caudill, apparently on February 19, 2013, despite the fact that he may not have fully exhausted his claims over the January 20, 2013 incident, and may have failed to exhaust the claim regarding the February 19, 2013 assault at all,[35] the exhaustion requirement does

---

[35] The undersigned would note that the plaintiff's letter to the WVRJA was written on February 4, 2013, fifteen days before the February 19, 2013 assault by inmate Caudill occurred.

not apply. Further, as for plaintiff's other claims, while complete exhaustion of administrative remedies is normally required, the undersigned notes that the procedure for submitting written inmate grievances outlined in WV Jail Standard 15.11, attached to defendants' first dispositive motion, states in pertinent part " . . . 2. Completed forms shall be collected on each shift by the roving officer and forwarded without delay to the addressee."[36] Further, despite the contentions in "Gene" Bittinger's affidavit that the ERJ's grievance system is tamper-proof, a careful reading of Bittinger's affidavit on that point actually says:

> The Eastern Regional Jail provides inmates with inmate grievance forms. Said forms to be placed in the locked mailboxes in each pod **or can be handed to the officers working in the area. The forms placed in locked mailboxes** are emptied daily by an office assistant, (not security staff), they are sorted and delivered to the appropriate person. All grievances submitted are logged by me and assigned a number for tracking.

(Dkt.# 31-2, ¶3 at 1)(emphasis added). It seems apparent then, that implied per policy and Mr. Bittinger's affidavit on the point, is an admission that at least under *some* circumstances, possibly when an inmate like plaintiff is confined to his cell on lockdown nearly continuously, and not free to move around the unit, that an inmate might instead sometimes rely on "the officers working in the area" to deposit his grievance in the locked mailbox on the pod for him. If a grievance never makes it into the locked mailbox to begin with, then defendants' assurances regarding office staff, not correctional officers, being the ones to empty the locked mailbox are irrelevant. It is conceivable that an inmate could avail himself of the one-hour period allotted for hygiene that the WVRJA affords to inmates in lockdown,[37] to deposit his own grievance in the box, but it is also entirely possible that an inmate who believes he has already successfully filed a grievance by handing it to staff to deposit would logically assume that his grievance had been filed. Moreover, as for plaintiff's being able to

---

[36] Dkt.# 31-3 at 1.

[37] Dkt.# 58-2.

successfully send the February 4, 2013 letter to the WVRJA, far from being conclusive on the point, while it appears from the record before the undersigned that the plaintiff may have still been confined in administrative segregation and dependent on the assistance of staff when he wrote and mailed the letter to the WVRJA,[38] even so, it is possible that some ERJ segregation staff may have been either more or less helpful than others toward disruptive inmates such as plaintiff, such that some of his grievances might have gotten through and some not. The court is "obligated to ensure that any defects in exhaustion were not procured from the action or inaction of prison officials." Aquilar-Allevaleda, 478 F.3d at 1225.

It is apparent from a review of plaintiff's pleadings that he is an inarticulate writer and the claims he attempts to assert are unclear at times. Nevertheless, a *pro se* plaintiff's allegations, however inartfully pled, entitle him to receive the opportunity to offer supporting evidence unless it appears beyond all doubt that the plaintiff could prove no set of facts which would entitle him to relief. Brown v. Department of Health & Mental Hygiene, 1993 U.S. App. LEXIS 23857 *1-2 (1993)(*per curiam*), *citing* Cruz v. Beto, 405 U.S. 319 (1972); Mitchell v. Beaubouef, 581 F.2d 412 (5th Cir. 1978).  Further, while a court is not expected to develop tangential claims from scant assertions in a complaint, if a *pro se* complaint contains potentially cognizable claims, a plaintiff should be allowed to particularize these claims. Thompson v. Echols, 1999 U.S. App. LEXIS 22373 *3 (4th Cir. 1999)(unpublished) (citation and internal quotation marks omitted).

In sum, because the full extent of plaintiff's injuries are unclear from the pleadings and because the complaint contains potentially cognizable claims, the complaint sets forth sufficient allegations that are sufficiently plausible on their face to survive a motion to dismiss with regard to

---

[38] It appears from the record that on January 20, 2013, the same day of the cell extraction, plaintiff received a disciplinary sanction for "obstructing, threats, and obscene language" for a January 11, 2013 incident over a missing spoon, earning him 30 days disciplinary detention effective dates January 12 – February 10, 2013.  See Dkt.# 31-5 at 3 - 5.  Subsequently, it appears he earned another disciplinary sanction, possibly for his January 20, 2013 outburst, for which he was sanctioned on January 24, 2013, for "refusing an order, creating a disturbance, and insubordination/insolence," earning him another 30 days in disciplinary detention, from February 11 – March 12, 2013. See Dkt.# 31-7 at 1 – 2.

exhaustion. Accepting the factual allegations as true, it appears that the plaintiff followed the grievance procedure insofar as the officers at the ERJ may have allowed him.

**D. Excessive Force**

Because it appears that the plaintiff was a pre-trial detainee at the time of the alleged assault, his claim is governed by the Due Process Clause of the Fourteenth Amendment instead of the Eighth Amendment. Bell v. Wolfish, 441 U.S. 520, 535 n. 16 (1979); Martin v. Gentile, 849 F.2d 863, 870 (4th Cir. 1988). Nonetheless, pre-trial detainees are subject to the same protection under the Fourteenth Amendment that prisoners receive via the Eighth Amendment. Hill v. Nicodemus, 979 F.2d 987, 999 (4th Cir. 1980).

To comply with the Eighth Amendment, prison punishment must comport with "the evolving standards of decency that mark the progress of a maturing society." Estelle v. Gamble, 429 U.S. 97, 102 (1976). However, while courts should give deference to a prison official's determination of what measures are necessary to maintain discipline and security, "the unnecessary and wanton infliction of pain" constitutes cruel and unusual punishment prohibited by the Eighth Amendment. Whitley v. Albers, 475 U.S. 312, 321-22 (1986). For a plaintiff to prove a claim of excessive force, he must first demonstrate that "the alleged wrongdoing was objectively 'harmful enough' to establish a constitutional violation." Hudson v. McMillian, 503 U.S. 1, 8 (1992) (quoting Wilson v. Seiter, 501 U.S. 294, 298, 303 (1991)). Second, he must show that prison officials inflicted unnecessary and wanton pain and suffering. Id. at 6.

With regard to prison disturbances, whether unnecessary and wanton pain and suffering was inflicted "ultimately turns on whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." Whitley, 475 U.S. at 320-21. To determine whether an official acted maliciously and sadistically, the following factors should be balanced: (1) "the need for application of force;" (2) "the relationship between the need and the amount of force that was used;" (3) "the extent of the injury;" (4) "the threat reasonably

perceived by the responsible official;" and (5) "any efforts made to temper the severity of a forceful response." Id. at 321; Williams v. Benjamin, 77 F.3d 756, 762 (4th Cir. 1996). The Supreme Court has made it clear that the core judicial inquiry in an excessive force claim is not "whether a certain quantum of injury was sustained, but rather, whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Wilkins v. Gaddy, 559 U.S. 34, 37 (2010) (citation and internal quotation marks omitted). Instead, the extent of injury is one factor to consider, but it "does not end [the analysis]." Hudson, 503 U.S. at 7.

Moreover, in the Fourth Circuit, "absent the most extraordinary circumstances, a plaintiff cannot prevail on an Eighth Amendment excessive force claim if his injury is *de minimis.*" Norman, 25 F.3d at 1263. In Norman, a jail officer swung his cell keys in the direction of the prisoner's face when the prisoner became disruptive. The prisoner asserted that he put his hands up to cover his face and the keys hit his thumb, causing his hand to swell. The Court ruled that the prisoner sustained *de minimis* injuries, proving that *de minimis* force was used. Further, in Taylor v. McDuffie, 155 F.3d 479 (4th Cir. 1998), cert. denied, 525 U.S. 1181 (1999), the Fourth Circuit found that a detainee who received "abrasions on his wrists and ankles, slight swelling in the jaw area, tenderness over some ribs and some excoriation of the mucous membranes of the mouth" as a result of an incident had sustained *de minimis* injuries. On the other hand, the United States Supreme Court has found that "bruises, swelling, loosened teeth and a cracked dental plate" are not *de minimis.* Hudson 503 U.S. at 10.

Although a *de minimis* injury reveals that *de minimis* force was used, Id. at 1262, the Fourth Circuit has held that in certain circumstances, a claim may be made even if the injury is *de minimis.* Specifically, the Fourth Circuit has stated:

> There may be highly unusual circumstances in which a particular application of force will cause relatively little, or perhaps no, enduring injury, but nonetheless will result in an impermissible infliction of pain. *Cf.* Hudson, 503 U.S. at ----, 112 S.Ct. at 1000 ("diabolic" or "inhuman" physical punishment unconstitutional, regardless of injury). In these circumstances, we believe that either the force used will be "of a

sort 'repugnant to the conscience of mankind,' and thus expressly outside the *de minimis* force exception, see Hudson, 503 U.S. at ----, 112 S.Ct. at 1000 (citations omitted), or the pain itself will be such that it can properly be said to constitute more than *de minimis* injury.

Norman, at 1264, n. 4.

Recognizing the principle that an injury does not have to be visible to be impermissible, the Fourth Circuit has held that "[m]ankind has devised some tortures that leave no lasting physical evidence of physical injury." Williams v. Benjamin, 77 F.3d 756, 762 and 762 n.2 (4th Cir. 1996)(inmate was strapped down, spread-eagled, for 8 hours in 4-point restraints after being sprayed with mace and not permitted to wash it off, use a toilet, or receive medical attention). See also, Jordan v. Gardner, 986 F.2d 1521, 1526, 1546 (9th Cir. 1993) (*en banc*)(the psychic pain female prisoners suffer when subjected to cross-gender pat down search satisfies the objective component of an 8th Amendment analysis, i.e., whether an injury inflicted is sufficiently serious). Consistent with this principle, the Fourth Circuit has held that the beating of a handcuffed inmate about the head and neck by prison guards, one of whom held the inmate's cuffed hands, in retaliation for his "mere use of a racial slur" may be force "of a sort 'repugnant to the conscience of mankind,'" even though the injuries sustained by the inmate were not severe. Melvin v. North Carolina Department of Corrections, 1995 U.S. App. LEXIS 23300 at *3 (4th Cir. Aug. 21, 1995) (per curiam) *quoting* Norman v. Taylor, *supra* at 1263 n.4.

**First January 20, 2013 Assault; Sgts. April Grona and Michelle Holloway, C.O.s Lawrence Wolfe, Adam Miller, Louis Simmons, Amanda Rice, and Cpl. Juanita Smith[39]**

Plaintiff contends that during a January 20, 2013 argument with C.O. Rice over being denied hygiene, recreation, and phone access, he referred to her as "a bitch." In response, approximately 45 minutes later, while plaintiff was lying quietly on his bed reading a book,[40] C.O. Rice initiated an

---

[39] The defendants' full names are found in the January 20, 2013 Incident Report prepared by Sgt. Grona. Dkt.# 31-6.

[40] Dkt.# 45-1, ¶12 at 1.

unwarranted cell extraction. The extraction team was led by Sgt. Grona. During the extraction, C.O. Wolfe jumped on plaintiff's back and right arm, and along with other C.O.s, beat, kicked and kneed him, both before and after he was handcuffed and shackled, and while he was not resisting.[41]

The defendants argue that contrary to plaintiff's claim that the cell extraction was unwarranted, plaintiff provoked it by being loud, disruptive, profane, and defiant with staff over the course of several hours and refusing to alter his behavior when reprimanded.[42] The defendants provide an affidavit from C.O. Rice, describing a several-hour-long series of events precipitated by plaintiff requesting his hygiene; being told by C.O. Rice he could have it when it was his turn; plaintiff becoming loud, cursing, calling C.O. Rice a whore and a bitch and repeatedly saying "fuck you get the fuck off my [intercom] box" to C.O. Rice; then repeatedly demanding his hygiene; kicking the door to his cell so hard that he set off the door alarms of nearby cells; and threatening to "fluid [sic] the cell and rip lights off the wall."[43] An Incident Report filled out by a Lt. Gene Bittinger appears to support C.O. Rice's version of the events, and further notes that plaintiff was "housed in A-7-5 for prior disciplinary sanctions[.]"[44] In support of this, attached to the defendants' first dispositive motion are copies of several WVRJA Inmate Requests and Incident Reports, indicating that plaintiff had a history of "attitude," fighting, and/or other disruptive, threatening, profane behavior, for which he had been charged with "obstructing, threats, and obscene language," and disciplined and sanctioned with lockdown several times.[45]

---

[41] Dkt.# 1 at 4 and Dkt.# 45-1, ¶15 at 2.

[42] Dkt.# 31-1 at 9.

[43] C.O. II Amanda Rice Incident Report, Dkt.# 31-6 at 5-6.

[44] Lt. Gene Bittinger Incident Report, Dkt. 31-6 at 1.

[45] See Dkt.# 31-4 at 2; 31-4 at 4; 31-4 at 5; and 31-5 at 1-5.

In their first dispositive motion, defendants admit that the "extraction was performed without incident and Plaintiff was immediately assessed by a nurse, with only minor complaints of pain being asserted."[46] In their second dispositive motion, filed in response to the amended complaint, defendants contend that the "extraction was performed without incident, other than two references [in the participating staff's Incident Reports] to Plaintiff's minor attempts at resisting being restrained."[47] Nonetheless, defendants consistently argue that the C.O.s' actions were "a reasonable response" to plaintiff's misconduct, and that any injury plaintiff suffered resulted from "the appropriate method of extraction routinely used by the responding officers to restore discipline."[48] Defendants seize on the slightly different accounts of the event provided by plaintiff in his original complaint; his court-approved form complaint, and his amended court-approved form complaint, suggesting that the plaintiff "fails to allege a consistent version of events so it cannot be said that the officers violated" his constitutional rights.[49] Defendants' dispositive motions also fault the plaintiff for failing to identify by name which officers struck him. They argue that plaintiff has produced "no evidence of the alleged use of excessive force," nor proved objective or subjective intent; thus, they argue that they are entitled to summary judgment on the claim. Defendants' reply elaborates on this, claiming that plaintiff "over-dramatized" the extraction team's actions to state an excessive force claim, and that the "minimal force used . . . was a proper response to the level of threat" plaintiff posed.[50] Finally, they claim that plaintiff's "lack of serious injury also weighs in favor of the relief" defendants seek.[51]

---

[46] Dkt.# 31-1 at 9.

[47] Dkt.# 58-1 at 11 – 12.

[48] Dkt.# 58-1 at 12.

[49] Dkt.# 58-1 at 12.

[50] Dkt.# 77 at 5.

[51] Id.

As a preliminary point, regarding plaintiff's inability to specifically and correctly identify which officers participated in the January 20, 2013 assaults, the undersigned notes that in plaintiff's amended complaint, he states generally that the only officers he could identify were Wolfe, Simmons, Miller, Rice, Holloway, Smith and Grona,[52] and that the officers who escorted him that day were wearing "masks and gear."[53] However, in his original complaint, he more clearly states that he "[c]ould not identify most of the Correctional Officers on the extraction team due to masks and gear."[54]

Attached to its first dispositive motion, the defendants provide a copy of a January 20, 2013 Incident Report prepared by Sgt. April Grona, identifying the members of the extraction team as herself; C.O. Louis Simmons; C.O. Gary Hart; C.O. Adam Miller, Sgt. Grona, and Cpl. Juanita Smith.[55] Sgt. Grona organized the extraction team and instructed plaintiff to lie on the floor, then directed the extraction team to enter the cell; C.O. Wolfe was the officer "on the shield" who was the first to enter plaintiff's cell on January 20, 2013. C.O. Simmons entered second and "had head control." C.O. Hart was third, and "had arm control." C.O. Miller was last with "leg control." Cpl. Juanita Smith "remained in the dayroom with the video camera." C.O. Hart applied handcuffs; C.O. Miller applied the shackles to plaintiff's ankles. Once restrained, C.O. Wolfe and Miller escorted plaintiff to "intake."[56] C.O. Hart "followed behind."[57] The LPNs who checked plaintiff for injuries

---

[52] Dkt.# 41-1, ¶44 at 4.

[53] Dkt.# 45-1, ¶21 at 2.

[54] Dkt.# 1 at 5.

[55] Dkt.# 31-6 at 1-2, 3, 9, 10, and 11.

[56] Dkt.# 31-6 at 3, 9, and 10.

[57] Dkt.# 31-6 at 9.

in "intake" were Tara Moon and Danielle Wegyrzniak.[58]  The officers who escorted plaintiff back to his cell after being checked at "intake" were C.O. Louis Simmons,[59] Wolfe and Miller;[60] C.O. Hart apparently "followed behind from intake back to A-Pod Section Cell 5" and "when on the bunk . . . stood by while the restraints were being taken off."[61]

Plaintiff identifies Cpl. Smith as the officer who videotaped the incident but failed to keep the camera trained on him during the assault.  Neither of the defendants' dispositive motions address the point, but the affidavit of Lt. "Gene" Bittinger attached to their original dispositive motion indicates that Bittinger "personally viewed the video recording taken by Cpl. Smith and discovered that the camera failed to record the extraction."[62] Cpl. Smith's own January 20, 2013 Incident Report only says

> On Sunday 20 January 2013 I was assigned as core rover 0700-1900 shift.  Sgt April Grona advised me that inmate . . . Stohl . . . in section seven cell five of Alpha pod was creating a disturbance; she then advised me that the following Officers would be conducting a cell extraction.  Officers Gary Hart, Louis Simmons, Lawrence Wolf [sic], Adam Miller suited up in the 360 suits. I retrieved the video camera from the supervisors [sic] office turned [sic] it on to test if it was working, once everyone suited up . . . they went to the front central to be brief on the situation.

Dkt.# 31-6 at 11.[63]

As a preliminary point, the undersigned notes that plaintiff is not the only party here whose pleadings "fail to allege a consistent version of events." Further, nowhere in their pleadings do the defendants address the substantive contents of September 25, 2013 WVRJA response letter that

---

[58] Dkt.# 31-6 at 2.

[59] Dkt.# 31-6 at 8.

[60] Dkt.# 31-6 at 10.

[61] Dkt.# 31-6 at 9.

[62] Dkt.# 31-2,¶6 at 2.

[63] Of note, nowhere does Cpl. Smith indicate whether the camera was in fact "working" when tested, nor does she describe what she witnessed, videotaped, or failed to videotape. At the bottom of her report, there is a hand-written note which advises "No Video Captured" with what appears to be the initials "DM" in a circle.

plaintiff received in response to his February 4, 2013 letter.[64] Defendants' silence on this point is of concern to the undersigned. The WVRJA response letter clearly indicates that after review of the January 20, 2013 incident, it was the WVRJA's finding that plaintiff's claim of being assaulted by the riot squad and then refused medical care afterwards had sufficient merit to warrant the C.O.s involved in the extraction being disciplined in some unknown way for the "issues . . . identified in regards to your handling process."[65]

Here, plaintiff's assertions notwithstanding, there is no evidence to suggest that the cell extraction was unwarranted. It is apparent from the record that plaintiff was loud, profane, disruptive and defiant over the course of several hours: each person who witnessed any portion of the January 20, 2013 altercation and produced an Incident Report averred that plaintiff provoked the cell extraction by his disruptive behavior and refusal to follow orders, and that the cell extraction was necessary to control plaintiff and maintain order. Accordingly, the Court finds that the plaintiff's contention that he did nothing to provoke the original January 20, 2013 altercation beyond verbally complaining about hygiene and recreation and using the word "bitch" once toward C.O. Rice lacks support in the record.

Nevertheless, the undersigned finds ample support in the record for plaintiff's contention that he immediately complied with the directive to get on the floor of his cell when he was subsequently ordered to do so; did not curse, fight back, or resist when shackled and handcuffed, or only resisted to such a negligible extent that only 2 of the 6 members of the extraction team thought it worth mentioning.[66] Despite being cooperative, plaintiff was beaten and jumped on anyway; he alleges this

---

[64] The only mention of the WVRJA letter by the defendants at all is in their reply, where they state that the plaintiff's Roseboro response "did nothing more than to broadly restate his claim that he had been injured by the use of excessive force and refused medical treatment and assert that an investigator for the West Virginia Regional Jail Authority supported his claims." Dkt.# 77 at 2.

[65] Dkt.# 45-1 at 7.

[66] Sgt. Grona reported that plaintiff was "resistant at first, but control was gained once all team members were in their positions" and that once plaintiff was returned to his cell [after being assessed in intake] he was "advised . . . that the restraints were going to be removed, that he was to remain where he was and not to move until all officers

26

occurred both before and after the restraints were applied. The undersigned notes that while the Incident Reports of the participating extraction team do not admit to using force, their descriptions of the purportedly uneventful the extraction are inconsistent with the level of injury plaintiff sustained. Therefore, the undersigned finds that the level of force used to subdue plaintiff appears to have been excessive, beyond what was necessary for a good-faith effort to maintain or restore discipline, and not in compliance with WVRJA protocol.

However, the undersigned also finds that, due to the inadequacies in the record, including the paucity of the defendants' responses, including their failure to address some of plaintiff's claims; the unavailability of a videotape of the incident; and the fact that the plaintiff did not attach copies of his medical records, the severity, present status and permanency of the plaintiff's injuries is unclear. However, the extent of injury suffered by an inmate is only one factor that may suggest whether the use of force can plausibly be thought necessary in a particular situation. Hudson v. McMillian, *supra* at 7. The January 20, 2013 Incident Report prepared by Danielle Wegyrzniak, the LPN who examined plaintiff after the cell extraction indicates only minimal injuries.[67] Nonetheless, construing all facts in plaintiff's favor as required, given plaintiff's detailed, specific allegations of a softball-sized hematoma on his right elbow that required emergency room treatment, consistent with the January 20, 2013 Incident Report prepared by Jessica Runkles, LPN, who observed him seven or eight hours after the initial assault, it is apparent that plaintiff's injuries from the incident were more

---

were out of the cell and the door was secured. Mr. Stohl complied." Dkt.# 31-6 at 1-2. C.O. Wolfe reported that" [o]nce at the door, inmate Stohl was given specific commands to lie on the floor . . .[he] was slightly hesitant at first but ultimately complied with said commands . . . I was the first man in and secured the inmate to the floor with the shield. The inmate was marginally resistant to our efforts at first, writhing around on the floor, attempting not to let us gain control. However, control was quickly assumed by all officers." Dkt.# 31-6 at 3. After being brought back to his cell, Wolfe reported that plaintiff "was placed face down on his bunk and advised that we would be removing his restraints, and that he was not to move. The inmate complied with our commands and did not move." Id.

[67] Dkt.# 31-6 at 12.

serious than originally documented.[68] In the instant case, the plaintiff has alleged injuries that are more than *de minimis*. Moreover, the kind of behavior alleged in the complaint, if true, could establish a violation of the Eighth Amendment. While it is true that qualified immunity protects government officials from suits for civil damages arising out of the exercise of their discretionary functions, here, under the circumstances, the actions of the ERJ officers in applying force appear to have violated "a clearly established statutory or constitutional right of which a reasonable person would have known,"[69] rendering that qualified immunity unavailable.

Plaintiff specifically alleges that Sgt. Grona witnessed the extraction and knew that her acting officers were using excessive force, but failed to intervene to control them. A careful reading of plaintiff's amended complaint reveals that the plaintiff makes no specific allegation against C.O. Rice, Sgt. Holloway, or Cpl. Juanita Smith as actually participating in the January 20, 2013 assaults.[70] Thus, the undersigned finds that this excessive force claim against Rice, Holloway and Smith should be dismissed, and that the claims against Sgt. Grona, C.O.s Lawrence Wolfe, Adam Miller, and Simmons should proceed.

**Second January 20, 2013 Assault; C.O.s Wolfe, Miller and Hart**

---

[68] Although it is conceivably possible that the right elbow injury was sustained in the second assault, after LPN Wegyrzniak had already examined him, plaintiff's original complaint asserts that his right elbow was injured in the first assault when "C.O. Wolf [sic], jumped on my back and arm[.]" See Dkt.# 1 at 4.

[69] Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).

[70] A careful review of the record indicates that C.O. Rice's only involvement was that she notified Sgt. Grona of the need for the cell extraction; she was not present at it and did not participate in it (Dkt.# 31-6 at 5-7); Sgt. Holloway's only involvement in the January 20, 2013 incident appears to have been that she was the designated supervisor for the 7 a.m. – 7 p.m. shift on January 20, 2013 (Dkt.# 31-8 at 1) and according to plaintiff, was one of the acting officers in charge of the A-Pod tower and A-Pod Unit that day (Dkt.# 45-1); plaintiff talked with her regarding the denial of hygiene before the cell extraction occurred (Dkt.# 45-1, ¶8 at 10. Cpl. Juanita Smith's only role was to wield the non-working camera. (Dkt.# 31-6 at 9).

Next, plaintiff alleges that on the way through the second door leading to the hall from unit A-7, the unknown officers accompanying him deliberately rammed his right shoulder into the steel door frame to inflict pain and injury, "knowing it was wrong."[71]

As noted *supra,* the defendants' first dispositive motion fails to address this claim. Their second motion argues that the plaintiff "now makes only a conclusory assertion that the officers "slammed" him into the door frame knowing "with no reasonable doubt that what they had done and were doing was wrong"[72] and faults plaintiff for failing to identify which officers rammed him into the doorframe. Plaintiff's Roseboro response and the defendant's reply shed no further light on the issue. Nonetheless, a review of the record indicates that plaintiff's court-approved form complaint did indeed raise this allegation.[73] Again, while qualified immunity protects government officials from suits for civil damages arising out of the exercise of their discretionary functions, here, under the circumstances, the actions of the ERJ officers in applying unnecessary force appear to have violated "a clearly established statutory or constitutional right of which a reasonable person would have known,"[74] rendering that qualified immunity unavailable.

Attached to defendants' first motion is a copy of a January 20, 2013 Incident Report by Sgt. April Grona, indicating that the officers who escorted plaintiff to "intake" that day were C.O. Wolfe and Miller,[75] followed by C.O. Hart.[76]

---

[71] Dkt.# 45-1, ¶22 at 2.

[72] Dkt.# 58-1 at 12.

[73] "They then escorted me to booking by control and while in the process they ramed [sic] me into the main door to POD A6 and A7 to hurt me." See Dkt.# at 11.

[74] Harlow, 457 U.S. at 818.

[75] Dkt.# 31-6 at 3, 9, and 10.

[76] Dkt.# 31-6 at 9.

Accepting the plaintiff's version of the events as true, there is simply no evidence in the record, beyond plaintiff's bald allegation that this assault occurred. A careful review of the record reveals that plaintiff has produced no evidence or witness to support his claim. Moreover, plaintiff does not assert any relevant injury. Nor has the plaintiff shown special circumstances which would show that the physical "punishment" inflicted in this case rises to the level of a constitutional violation even without a showing of injury.

Because the defendants have filed an alternative motion for summary judgment, attached affidavits, exhibits and other documents to their motion, the Court construes defendants' dispositive motion as one for summary judgment. The nonmoving party is required "to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." Celotex Corp. *supra* at 322. The plaintiff's response to the defendants' motion does not meet this standard. Based on the record currently before the Court, without establishing even a *de minimis* injury, the plaintiff cannot maintain a claim of excessive force, and thus the defendants Wolfe, Miller and Hart are entitled to judgment as a matter of law.

**Third January 20, 2013 Assault; C.O.s Simmons, Wolfe, Miller and Hart**

In his amended complaint, for the first time plaintiff alleges that the officers who escorted him back from intake "slammed him on his concrete bunk and continue [sic] to assault him while handcuffed and shackled . . . [while plaintiff] was clearly compliant with every order given[.]"[77] Plaintiff gives no further details of this altercation.

Neither of defendants' dispositive motions addresses this claim. However, a January 20, 2013 Incident Report by Sgt. April Grona attached to the defendants' first dispositive motion indicates that the officers who returned plaintiff to his cell that day were C.O. Louis Simmons,[78] Wolfe and

---

[77] Dkt.# 45-1, ¶27 at 3.

[78] Dkt.# 31-6 at 8.

Miller;[79] with C.O. Hart apparently following from behind again.[80] Grona's Incident Report merely states that after plaintiff was medically checked he

> was escorted back to his cell.  Once inside the cell, I advised . . . [him] that the restraints were going to be removed, that he was to remain where he was and not to move until all officers were out of the cell and the door was secure.  Mr. Stohl complied. All team members [then] exit[ed] the cell[.]

Dkt.# 31-6 at 2.

Likewise, a January 20, 2013 Incident Report by C.O. II Gary Hart notes that after plaintiff's

> mechanical restraints were secure Ofc Miller and Ofc Wolfe stood him on his feet and began to walk out of the section up the hallway, I followed behind Ofc Wolfe and Ofc Miller to Intake to be checked by Nurse Danielle Wegrzniak when cleared of injuries I followed behind from Intake back to A-Pod Section 7 Cell 5 when on the bunk I stood by while the restraints were being taken off.  Sgt. April Grona gave him commands to stay on the bunk until all Officers were out of the cell and the door was secure he complied we exited the section[.]

Dkt.# 31-6 at 9.

Finally, an Incident Report prepared the same day by C.O. II Adam Miller on the point states

> After I secured his legs with the leg restraints and his Arms [sic] we [sic] secured, we then help [sic] Mr. Stohl to his feet and Ofc Wolfe and I escorted him to intake and placed him in a chair to be checked by a nurse for any injuries or complaints. Once Mr. Stohl was cleared of any injuries, Ofc wolf [sic] and I then escorted him from intake back to section seven cell 5. I then removed the handcuffs and leg restraints. He was then given the order to stay on the bunk and not to move until we were out [sic] the cell and the door was secured.  The door was then secured and Ofc Wolf, Ofc Simmons, Ofc Hart and I exited[.]

Dkt.31-6 at 10.

Plaintiff's <u>Roseboro</u> response and the defendant's reply do not clarify the issue any further. It seems likely then, that given the fact that plaintiff never raised this claim until he filed his amended complaint, when he clearly would have been aware of it at the outset; the lack of specific details provided by plaintiff to support the claim; his failure to allege any injury from it; and the

---

[79] Dkt.# 31-6 at 10.

[80] Dkt.# 31-6 at 9.

unremarkable accounts of the plaintiff's return to his cell by all correctional officers involved, that this third alleged assault did not occur. Thus, this claim against C.O. Miller, Simmons, Wolfe and Hart fails to state a claim upon which relief can be granted and should be dismissed with prejudice.

## E. Deliberate Indifference Claims to Serious Medical Needs

To state a claim under the Eighth Amendment for ineffective medical assistance, the plaintiff must show that the defendant acted with deliberate indifference to his serious medical needs. Estelle v. Gamble, 429 U.S. 97, 104 (1976). To succeed on an Eighth Amendment cruel and unusual punishment claim, a prisoner must prove: (1) that objectively the deprivation of a basic human need was "sufficiently serious," and (2) that subjectively the prison official acted with a "sufficiently culpable state of mind." Wilson v. Seiter, 501 U.S. at 298.

A serious medical condition is one that has been diagnosed by a physician as mandating treatment or that is so obvious that even a lay person would recognize the need for a doctor's attention. Gaudreault v. Municipality of Salem, Mass., 923 F.2d 203, 208 (1st Cir. 1990), cert. denied, 500 U.S. 956 (1991). A medical condition is also serious if a delay in treatment causes a life-long handicap or permanent loss. Monmouth County Corr. Inst. Inmates v. Lanzaro, 834 F.2d 326, 347 (3rd Cir. 1987), cert. denied, 486 U.S. 1006 (1988).[81]

---

[81] The following are examples of what does or does not constitute a serious injury. A rotator cuff injury is not a serious medical condition. Webb v. Prison Health Services, 1997 WL 298403 (D. Kansas 1997). A foot condition involving a fracture fragment, bone cyst and degenerative arthritis is not sufficiently serious. Veloz v. New York, 35 F.Supp.2d 305, 312 (S.D.N.Y. 1999). Conversely, a broken jaw is a serious medical condition. Brice v. Virginia Beach Correctional Center, 58 F. 3d 101 (4th Cir. 1995); a detached retina is a serious medical condition. Browning v. Snead, 886 F. Supp. 547 (S.D. W. Va. 1995). And, arthritis is a serious medical condition because the condition causes chronic pain and affects the prisoner's daily activities. Finley v. Trent, 955 F. Supp. 642 (N.D. W.Va. 1997). A pituitary tumor is a serious medical condition. Johnson v. Quinones, 145 F.3d 164 (4th Cir. 1998). A plate attached to the ankle, causing excruciating pain and difficulty walking and requiring surgery to correct it is a serious medical condition. Clinkscales v. Pamlico Correctional Facility Med. Dep't., 2000 U.S. App. LEXIS 29565 (4th Cir. 2000). A tooth cavity can be a serious medical condition, not because cavities are always painful or otherwise dangerous, but because a cavity that is not treated will probably become so. Harrison v. Barkley, 219 F.3d 132, 137 (2nd Cir. 2000). A prisoner's unresolved dental condition, which caused him great pain, difficulty in eating, and deterioration of the health of his other teeth, was held to be sufficiently serious to meet the Estelle standard. Chance v. Armstrong, 143 F.3d 698, 702 - 703 (2nd Cir. 1998). A degenerative hip condition that caused a prisoner "great pain over an extended period of time and . . . difficulty walking" is a serious condition. Hathaway v. Coughlin, 37 F.3d 63, 67 (2nd Cir. 1994). Under the proper circumstances, a ventral hernia might be recognized as serious. Webb v. Hamidullah, 281 Fed. Appx. 159 (4th Cir. 2008). A twenty-two hour delay in providing treatment for inmate's

The subjective component of a cruel and unusual punishment claim is satisfied by showing that the prison official acted with deliberate indifference. Wilson, 501 U.S. at 303. A finding of deliberate indifference requires more than a showing of negligence. Farmer v. Brennan, 511 U.S. 825, 835 (1994). A prison official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. at 837. A prison official is not liable if he "knew the underlying facts but believed (albeit unsoundly) that the risk to which the fact gave rise was insubstantial of nonexistent." Id. at 844.

"To establish that a health care provider's actions constitute deliberate indifference to a serious medical need, the treatment, [or lack thereof], must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." Miltier v. Beorn, 896 F.2d 848, 851 (4th Cir. 1990). A mere disagreement between the inmate and the prison's medical staff as to the inmate's diagnosis or course of treatment does not support a claim of cruel and unusual punishment unless exceptional circumstances exist. Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985). A constitutional violation is established when "government officials show deliberate indifference to those medical needs which have been diagnosed as mandating treatment, conditions which obviously require medical attention, conditions which significantly affect an individual's daily life activities, or conditions which cause pain, discomfort or a threat to good health." See Morales

broken arm was a serious medical need. Loe v. Armistead, 582 F.2d 1291, 1296 (4th Cir. 1978). A ten-month delay in providing prescribed medical shoes to treat severe and degenerative foot pain causing difficulty walking is a serious medical need. Giambalvo v. Sommer, 2012 WL 4471532 at *5 (S.D.N.Y. Sep. 19, 2012). Numerous courts have found objectively serious injury in cases involving injury to the hand, including broken bones. See, e.g., Lepper v. Nguyen, 368 F. App'x. 35, 39 (11th Cir. 2010); Andrews v. Hanks, 50 Fed. Appx. 766, 769 (7th Cir. 2002); Bryan v. Endell, 141 F.3d 1290, 1291 (8th Cir. 1998) Beaman v. Unger, 838 F.Supp. 2d 108, 110 (W.D. N.Y. 2011); Thompson v. Shutt, 2010 WL 4366107 at *4 (E.D. Cal. Oct. 27, 2010); Mantigal v. Cate, 2010 WL 3365735 at *6 (C.D. Cal. May 24, 2010) report and recommendation adopted, 2010 WL 3365383 (C.D. Cal. Aug. 24, 2010); Johnson v. Adams, 2010 WL 1407787 at *4 (E.D. Ark. Mar. 8, 2010) report and recommendation adopted, 2010 WL 1407790 (E.D. Ark. Mar. 31, 2010); Bragg v. Tyler, 2007 WL 2915098 at *5 (D.N.J. Oct. 4, 2007); Vining v. Department of Correction, 2013 U.S. Dist. LEXIS 136195 at *13 (S.D.N.Y. 2013)(chronic pain arising from serious hand injuries satisfies the objective prong of Eighth Amendment deliberate indifference analysis). A three-day delay in providing medical treatment for an inmate's broken hand was a serious medical need. Cokely v. Townley, 1991 U.S. App. LEXIS 1931 (4th Cir. 1991); and evidence of recent traumatic injury is sufficient to demonstrate a serious medical need. See, e.g., H.C. by Hewett v. Jarrard, 786 F.2d 1080, 1086 – 87 (11th Cir. 1986) (soft-tissue shoulder injury) and Aldridge v. Montgomery, 753 F.2d 970, 972-73 (11th Cir. 1985)(one and a half inch bleeding cut under the eye).

Feliciano v. Calderon Serra, 300 F.Supp.2d 321, 341 (D.P.R. 2004) (citing Brock v. Wright, 315 F.3d 158, 162 (2nd Cir. 2003)).

**Initial Examination after the January 20, 2013 Cell Extraction; Unknown ERJ Medical Staff**

The plaintiff claims that an unknown nurse saw him in "intake/control" immediately after the first January 20, 2013 assault but even after he reported that his right arm and back hurt badly and that "something was wrong with" his arm, this nurse and other medical staff people "ignored" his response and he was returned to his cell without receiving any medical treatment.

Attached to the defendants' first dispositive motion is an Incident Report prepared by the one of the nurses[82] who examined plaintiff that day, Danielle Wegrzyniak, LPN.[83] Wegrzyniak's Incident Report states

> At approximately 1240 this nurse assessed inmate . . . Stohl after being extracted from his cell. IM stated he had pain in his rib area and his wrists. This nurse visualized reddened areas around wrist [sic] from handcuffs. No troubled [sic] breathing noted. IM had full range of motion and was able to move fingers with no complications. Capillary Refill [sic] was less than three seconds. IM advised to notify medical if rib pain continued . . .

Dkt.# 31-6 at 12.

The defendants' first and second dispositive responses contend that plaintiff only had minor complaints after the cell extraction and when he complained of additional pain later, he was taken to the hospital. They deny plaintiff has any permanent injury, noting that he was subsequently "involved in two other incidents" which required nursing staff evaluation[84] and never mentioned his "allegedly serious ongoing damage to his elbow and lower back." Finally, they argue plaintiff's

---

[82] Sgt. April Grona's January 20, 2013 Incident Report indicates that a second nurse, Tara Moon, LPN, also was present. Dkt.# 31-6 at 2. However, there is no Incident Report in the record from Nurse Moon.

[83] Dkt.# 31-6 at 12.

[84] The "records" of each of these evaluations were merely very brief Incident Reports; one was completed in response to the examination performed after the February 19, 2013 assault by inmate Caudill by Tina Adams LPN (inexplicably incorrectly dated for January 12, 2013), and one was prepared by Christina Church LPN, after plaintiff reported having suicidal thoughts on March 22, 2013. Neither included any actual medical records. See Dkt.# 31-9 at 6 and Dkt.# 31-10 at 4.

claim should fail because he has not alleged that the defendants' failure to provide him with medical treatment was accompanied by "a sufficiently culpable state of mind." Their second dispositive motion appears to argue that this claim should fail because all of the named defendants are non-medical personnel, and that with the exception of C.O. Rice, to whom plaintiff

> asserts made a single refusal to obtain medical care for him, there is not even as [sic] suggestion by the Plaintiff that any of officers [sic] interfered with treatment by the facility's medical staff or were indifferent to any misconduct by the medical staff. The single issue as to C.O. Rice does not rise to the level necessary to state an actionable claim.

Dkt.# 58-1 at 17.

It is unclear from Wegrzyniak's report whether she examined plaintiff's elbow. Nonetheless, it is apparent from the overall record that when she examined him immediately after the first assault, plaintiff's elbow hematoma had not yet manifested itself. The formation of a hematoma is not an instantaneous event; rather, hematomas form when a blood vessel leaks into surrounding tissue, a process that occurs over a period of time:

> A hematoma is a collection of blood, usually clotted, outside of a blood vessel that may occur because of an injury to the wall of a blood vessel allowing blood to leak out into tissues where it does not belong . . . The damaged blood vessel may be an artery, vein, or capillary; and the bleeding may be very tiny . . . or it can be large and cause significant blood loss. It is a type of internal bleeding that is either clotted or is forming clots. Hemorrhage is the term used to describe active bleeding and is often graded on a severity score of one to four (15% to >40% of total blood volume). Hematoma describes bleeding that has already started to become clotted. However, the distinction sometimes is not clear as some hematomas enlarge over time as active bleeding can add to the mass of the hematoma.

See http://www.emedicinehealth.com/hematoma/article_em.htm

Therefore, it is likely that at the time plaintiff was first examined, the bleeding into his right antecubital tissue had not accumulated to the point of being a visible mass. Nevertheless, as is evident from the record, over time, as the blood accumulated into the surrounding tissue, plaintiff would have had increasing discomfort and inability to bend his arm.

"Deliberate indifference is a high legal standard." Toguchi v. Chung, 391 F.3d 1051, 1060 (9th Cir. 2004). Plaintiff's complaint alleges that the "unknown nurse" Wegrzyniak was deliberately

indifferent to his serious medical needs. However, fatal to his claim, plaintiff has not named Wegrzyniak as a defendant in this action, thus, no claim against her can lie. However, even if she had been so named, there is no evidence in the record to show that she knew of and disregarded an excessive risk to plaintiff's health or safety, let alone that she was both aware of the facts from which the inference could be drawn that there was a substantial risk of serious harm, and that she also drew the inference. Farmer, 511 U.S. at 837. Accordingly, even if plaintiff had named Wegrzyniak as a "Jane Doe" defendant, which he did not, the undersigned finds no deliberate indifference on LPN Wegrzyniak's part.

**Sgts. April Grona and Michelle Holloway, C.O.s Lawrence Wolfe, Adam Miller, Louis Simmons, Amanda Rice, and Cpl. Juanita Smith**

Plaintiff alleges that C.O. Rice was deliberately indifferent to his serious medical needs. Specifically, he alleges that after he was returned to his cell after the January 20, 2013 assaults, when repeatedly rang his intercom to ask for medical attention, C.O. Rice, working the tower there that day, threatened him with the extraction team again if he continued.[85] Plaintiff contends that he was so intimidated by this that he stopped asking, and thus it was not until "approximately 6-7 hours later" when nurse "Jess" initiated his transport to the E.R. that he received any medical care for his injuries. Even then, plaintiff alleges that he was not actually taken to the E.R. until approximately 10 p.m.

Specifically, plaintiff's original complaint states "[t]hey denied me medical treatment for over [6] hours and the [2nd] shift Nurse Jess, seen [sic] my arm and bruises and had me immediately transported to Martinsburg Emergency Room for X-rays of back and arm."[86] His court-approved form complaint states he "[w]as injured by correctional officers and denied medical treatment for entire afternoon untill [sic] following shift seen i needed imeadiate [sic] medical attention and was

---

[85] Dkt.# 45-1, ¶¶30 – 33 at 3.

[86] Dkt.# 1 at 4.

transported to Martinsburg Emergency Room for X Rays and treatment."[87] Finally, his amended

complaint states

> [a]fter the extraction officers finished assaulting the plaintiff and left . . . [plaintiff]
> asked for medical help and treatment due to pain in . . . lower back and massive
> hematoma on his right arm.  The plaintiff was denied medical treatment; the plaintiff
> pushed the intercom in the cell A-7 cell 5 when seeking medical treatment.  C.O. Rice
> stated over the intercom . . . that if he asked for medical assistance or pushed the
> intercom button again she would send the extraction officers back again.  Out of fear
> for his life and safety the plaintiff did not push the . . . button or ask for medical
> assistance again.[88]

In his court-approved form complaint, plaintiff alleges that after he was brought back from

the E.R., Mr. Sheely, the jail administrator, came to visit him and apologized for the officers' actions.

Further, a Sgt. Tate was called in, and he told plaintiff

> they cant [sic] just come beat . . . [you] up while in segregation when [you're] . . . no
> danger to anyone or . . . [yourself] . . . [I have] never seen it and [you] should have
> been transported and medical issues adressed [sic] by the previous shift way earlier in
> the day not 6 to 7 hours later.[89]

It is unclear at what time C.O. Rice went off duty that day, but it appears from plaintiff's

pleadings, and from Incident Reports of various staff that at least some of the ERJ staff worked a

7:00 p.m. – 7:00 a.m. shift.[90]  Thus, if Rice also went off duty that at 7:00 p.m., it was only after that

time that plaintiff was able to summon help from nurse Jess as she passed by. C.O. Rice's January

20, 2013 Incident Report, completed at 3:20 p.m. on January 20, 2013, ends with her reporting

having notified Sgt. Grona of the need for cell extraction; it makes no mention of plaintiff requesting

medical care after being returned to his cell,[91] nor does the Incident Report of any other defendant.

---

[87] Dkt.# 8 at 7.

[88] Dkt.# 45-1, ¶¶ 30 – 33, at 3.

[89] Dkt.# 8 at 11.

[90] See Sgt. Michelle Holliday Incident Report, Dkt.# 31-8 at  1, and the transporting officers' log, Dkt.# 31-8 at 3.

[91] Dkt.# 31-6 at 7.

The record is simply devoid of any information as to what went on between the time plaintiff was returned to his call and the time that nurse "Jess" discovered his injury:

> At approximately 2030 This [sic] nurse was doing med pass in A7 when IM Stohl approached the door and stated that he had been extracted from the cell earlier in the day and his arm was hurting. This nurse observed a large bruise and knot on IM right arm near the antecubital area. IM Stohl was unable to mobilize arm [sic] without severe discomfort. After further assessment it appeared that IM Stohl may have fractured or dislocated his elbow. IM was then sent via transport to CHI for further treatment.[92]

It would appear, then, that the plaintiff's right arm injury was not addressed until 8:30 p.m., a delay of at least eight hours. Plaintiff alleges that it was not until 10 p.m. that he was actually taken to the hospital for treatment. An Incident report prepared by Sgt. Michelle Holliday that day states

> On Sunday, 20 January 2013, I was the designated supervisor for the 1900-0700 hours shift. At 2040 hours (per my watch) I was informed by Nurse Jessica Runkles that Mr. Regis Stohl . . . would need to be transported to the hospital due to possible injury to his elbow. I advised Officers Jonathan Cole and Caleb Wade that they would be transporting Mr. Stohl.

> At 2137 hours Officers Cole, Wade and Mr. Stohl exited the facility en route to City Hospital.

Dkt.# 31-8 at 1.

Thus, it was 9:37 p.m. when plaintiff was finally taken to the hospital to be treated for his injuries. The transporting officers' log of the trip indicate that they arrived at the hospital at 9:54 p.m.; plaintiff was seen by a physician at 10:18 p.m.; was treated, received x-rays and medication; was discharged at 11:57 p.m.; and arrived back at the facility at 12:12 a.m. on January 21, 2013.[93] Therefore, it is apparent that nine and a half hours elapsed before plaintiff actually received emergency care for his injuries.

The record before the undersigned does not explain why no staff member responded to plaintiff's increasing pain and requests for medical care for at least eight hours for what was

---

[92] See January 20, 2013 Incident Report prepared by Jessica Runkles, LPN, Dkt.# 31-8 at 2.

[93] Log of transporting officers, Dkt.# 31-8 at 3.

obviously a very visible and painful injury. Under the circumstances alleged, and after a thorough review of the record, given the obviously painful and alarming-looking injury described by nurse Jess, plaintiff's failure to actively demand medical care for as long as he did lends credence to his claim that he was threatened when he did so. While it is true that qualified immunity protects government officials from suits for civil damages arising out of the exercise of their discretionary functions, here, the actions of C.O. Rice and the unknown other correctional officers who may have disregarded plaintiff's pleas for medical assistance during that time appear to have violated "a clearly established statutory or constitutional right of which a reasonable person would have known,"[94] rendering that qualified immunity unavailable.

Despite defendants' assertion that plaintiff only alleged that C.O. Rice made a "single refusal" to obtain medical care for him, it is apparent from plaintiff's ineptly-worded complaint(s) that he attempted to do as instructed by nurse Wegrzyniak,[95] and repeatedly requested medical care over at least a seven-to-eight-hour period of time, only stopping when C.O. Rice finally threatened him. Merely because plaintiff only documented C.O. Rice's final statement on the point does not mean that there were no prior refusals. Further, defendants' implicit argument that because none of the named defendants were medical staff they could not be deliberately indifferent to plaintiff's serious medical needs ignores the obvious: while in segregation, plaintiff was completely dependent upon the officers for his access to medical care. Unless the officers notified medical for plaintiff, or medical staff just happened to come by, as nurse Jess later did, plaintiff had no way to contact medical independently. Defendants' contention that plaintiff failed to suggest that any of the officers interfered with medical staff's treatment of plaintiff, or were indifferent to medical staff's wrongful conduct is likewise questionable; if the correctional officers failed to notify medical staff of a change

---

[94] Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).

[95] Wegrzyniak's Incident report documented her instruction to plaintiff to "notify medical" if his pain continued. Dkt.# 31-6 at 12.

in plaintiff's condition, the officers committed an Eighth Amendment violation.[96] Thus, plaintiff has sufficiently proven the subjective prong necessary to establish an Eighth Amendment claim of deliberate indifference.

Despite defendants' characterization of plaintiff's injuries as "minor," the undersigned finds that plaintiff has sufficiently proven the objective prong necessary to prove an Eighth Amendment claim of deliberate indifference, in that his right arm hematoma is a "sufficiently serious" medical need. Wilson, *supra* at 298; see also H.C. by Hewett v. Jarrard, 786 F.2d 1080, 1086 – 87 (11th Cir. 1986) (evidence of recent traumatic injury, a soft-tissue shoulder injury, is sufficient to demonstrate a serious medical need). Moreover, because a serious medical condition is one that has been diagnosed by a physician as mandating treatment, or one that is so obvious that even a lay person would recognize the need for a doctor's attention,[97] again, clearly, here, LPN Runkles, the emergency room staff, and ERJ medical staff all saw fit to immediately intervene to treat plaintiff's injuries as soon as they became aware of them.

Accordingly, viewing the allegations in the complaint in the light most favorable to the plaintiff as required, it appears that after the initial exam, despite plaintiff's repeated complaints of pain and requests for medical care for an obvious injury, the officers did not provide any further care for at least nine and a half hours. A constitutional violation is established when "government officials show deliberate indifference to those medical needs which have been diagnosed as mandating treatment, conditions which obviously require medical attention, conditions which significantly affect an individual's daily life activities, or conditions which cause pain, discomfort or a threat to good health." Morales Feliciano, 300 F.Supp.2d at 341.

---

[96] "Prison officials are deliberately indifferent to a prisoner's serious medical needs when they deny, delay, or intentionally interfere with medical treatment." Hunt v. Dental Dep't., 865 F.2d 198, 201 (9th Cir. 1989) (internal quotation marks and citation omitted).

[97] Gaudreault, *supra* at 208.

Given the limited record before me as to the past, present and future status of plaintiff's injuries, and in recognition of the fact that a large enough hematoma in the elbow joint can result in a potentially serious limb injury such as compartment syndrome, requiring a fasciotomy to avoid long-term limitations in mobility, requiring referral to an orthopedic surgeon,[98] the undersigned cannot say that with certainty whether plaintiff has sustained a *de minimis* or serious and permanent right elbow and/or back injury from the January 20, 2013 altercations.

Therefore, then, there are genuine issues of material fact as to the severity of the injuries and whether C.O. Rice or any of the other named defendant correctional officers knew of plaintiff's condition during the nine and a half hours in which no medical care was provided. It is unclear from the record who, besides Wolfe, Holloway, and Rice, of the remaining named defendants were actually present in Pod-A-7 that day to hear plaintiff's repeated requests for medical care. Consequently, neither Rice nor any of the other named defendants are entitled to summary judgment on this claim.

**Delay by Unknown ERJ Staff in Transporting Plaintiff to Emergency Room After the Need for Treatment was Identified**

The plaintiff appears to allege that unnamed other ERJ staff intentionally further delayed his immediate transport to the emergency room once LPN Runkles determined he needed to go, in deliberate indifference to his serious medical needs.

However, again, fatal to his claim, plaintiff has failed to identify any individual, or name any John or Jane Doe defendant(s) responsible for the alleged delay. Nevertheless, even if he had, the undersigned does not find that an hour and a half delay in transporting an inmate to the emergency room for an undetermined injury, which at that point in time could have been a hematoma, a fracture or a dislocated elbow constitutes deliberate indifference, given the staffing, transportation, and security logistics inherent in making arrangements to transport an inmate to a hospital from a prison.

---

[98] See http://www.amjorthopedics.com/fileadmin/qhi_archive/ArticlePDF/AJO/038090470.pdf

Where delay in receiving medical treatment is alleged, a prisoner must demonstrate that the delay led to further injury. <u>McGuckin v. Smith</u>, 974 F.2d 1050, 1060 (9th Cir. 1992). Plaintiff has not shown this, and thus, the undersigned finds no deliberate indifference in the delay, and this claim fails to state a claim upon which relief can be granted against any defendant.

## Failure to Provide Further Treatment to Right Arm Wound after February 19, 2013; Unnamed ERJ Medical Staff

Plaintiff alleges that upon his return to medical after the "calciumized flesh" was cut out of his hematoma and the wound packed by unspecified ERJ medical staff, he was returned to segregation unit A-7 cell 6. Thereafter, he alleges that the ERJ medical staff were deliberately indifferent to his serious medical needs because, despite their awareness of his packed wound, he received no further treatment for his arm, and (either "days" or "weeks" later) had to remove the packing out himself and fashion a bandage from a bed sheet to care for the wound, which later became infected.

The record before the undersigned does not explain why no ERJ medical staff ensured follow up on plaintiff's incised/drained/packed right arm wound; neither of defendants' dispositive motions or their reply even address this claim, beyond pointing out that plaintiff failed to exhaust his administrative remedies on it. Plaintiff's response provides no further information; it merely reiterates his claims.

Accordingly, construing the limited facts before me in favor of the plaintiff as required, if the unnamed ERJ medical staff provided no further wound care all once the wound was evacuated and packed, forcing the plaintiff to treat the wound himself, it suggests that they may have known of and disregarded a risk of harm to plaintiff's health. "The treatment, or, here, the lack thereof, was so "grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." <u>Miltier v. Beorn</u>, *supra* at 851. Although it is true that qualified immunity protects government officials from suits for civil damages arising out of the exercise of their

discretionary functions, here, the actions of the unnamed ERJ medical staff who packed the wound and then failed to follow it violated "a clearly established statutory or constitutional right of which a reasonable person would have known,"[99] rendering that qualified immunity unavailable.

In the instant case, the plaintiff has alleged injuries that are more than *de minimis*. Moreover, the kind of behavior alleged in the complaint, if true, could establish a violation of the Eighth Amendment.

However, here again, plaintiff has failed to identify which ERJ medical staff members defaulted on their obligation to follow up on the packed wound to ensure proper removal and infection control, nor has plaintiff named any John or Jane Doe Defendants as being culpable. Therefore, based on the record presently before me, the undersigned has no alternative but to recommend that this claim be dismissed *without prejudice* for failure to name proper defendant(s). Although this case has been pending for over a year, and Rule 4(m), in addition to specifying the 120-day time period for service of process, states that "if the plaintiff shows good cause for the failure [to serve in a timely way], the court shall extend the time for service for an appropriate period." While this language appears to require the court to grant requested extensions of time, the requirement applies only if the plaintiff can establish good cause; the determination as to whether good cause exists is one left to the court's discretion. San Giacomo-Tano v. Levine, 1999 U.S. App. LEXIS 26997 at * 3-4 (4th Cir. 1999) (unpublished) *per curiam*.

## F. Failure to Protect Claims Against C.O. Vanorsdale, Page and Athey

The Eighth Amendment imposes a duty on prison officials "to protect prisoners from violence at the hands of other prisoners." Farmer v. Brennan, 511 U.S. 825, 833 (1994). "Being violently assaulted in prison is simply not 'part of the penalty that criminal offenders pay for their offenses against society.'" Id. at 834 (quoting Rhodes v. Chapman, 452 U.S. 337, 347 (1981)). "For a

---

[99] Harlow, 457 U.S. at 818..

claim based on failure to prevent harm, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm," and that the prison officials acted with "'deliberate indifference' to inmate health or safety.'" Id. The Supreme Court left open the point at which a risk of inmate assault becomes sufficient for Eighth Amendment purposes. Id. n3. However, the Supreme Court held that "[a] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. Id. at 837.

There is no dispute in the record that the plaintiff was assaulted by inmate Caudill on February 19, 2013. However, plaintiff does not allege, and the record does not show that prior to that date, plaintiff ever advised any defendant that he was at risk from Caudill, or that Caudill was a "keep away" of his. Accordingly, because the record does not conclusively establishes facts sufficient to make any finding regarding whether any of the named defendants were aware of any facts from which an inference could be drawn that the plaintiff was at risk of injury at the hands of inmate Caudill prior to the February 19, 2013 assault, the undersigned recommends that these claims against defendants Vanorsdale, Page, and Athey be dismissed with prejudice for failure to state a claim upon which relief can be granted.

## G. Retaliation Claims

As a preliminary matter, prisoners' claims of bias and retaliation are to be viewed with skepticism. Cochran v. Morris, 73 F.3d 1310, 1317 (4th Cir. 1996). Retaliation is usually difficult to prove directly; in most cases it must be inferred from the circumstances surrounding the prisoner's exercise of his constitutional rights and his subsequent punishment. See Benson v. Cady, 761 F.2d 335, 342 (7th Cir. 1985).

In order to sustain a claim based on retaliation, a plaintiff "must allege either that the retaliatory act was taken in response to the exercise of a constitutionally protected right or that the act itself violated such a right." Adams v. Rice, 40 F.3d 72, 75 (4th Cir.1994). Additionally, a plaintiff alleging that a government official retaliated against her in violation of a constitutional right must demonstrate, *inter alia,* that she suffered some adversity in response to her exercise of protected rights. American Civil Liberties Union of Maryland, Inc. v. Wicomico County, Md., 999 F.2d 780, 785 (4th Cir. 1993). To prevail on a claim of retaliation, a prisoner must establish (1) a specific constitutional right, (2) the defendant's intent to retaliate against the prisoner for his or her exercise of that right, (3) a retaliatory adverse act, and (4) causation. Causation requires a showing that "but for the retaliatory motive, the complained of incident … would not have occurred." Johnson v. Rodriguez, 110 F.3d 299, 310 (5th Cir. 1997) (quoting Woods v. Smith, 60 F.3d 1161, 1166 (5th Cir. 1995), *cert. denied,* 522 U.S. 995 (1997). The inmate must allege more than his personal belief that he is the victim of retaliation. Johnson v. Rodriguez, 110 F.3d at 310. Therefore, *"in forma pauperis* plaintiffs who claim that their constitutional rights have been violated by official retaliation must present more than naked conclusory allegations of reprisal" to survive a proper motion for dismissal of their claim. See Adams v. Rice, 40 F.3d at 75; Woods v. Smith, 60 F.3d at 1166. "The inmate must produce direct evidence of motivation or, the more probable scenario, 'allege a chronology of events from which retaliation may plausibly be inferred.'" Woods v. Smith, 60 F.3d at 1166.

Here, plaintiff alleges that his Eighth and Fourteenth Amendment rights were violated when the defendants retaliated against him on January 20, 2013 for complaining about the denial of hygiene, phone and exercise by initiating an unwarranted cell extraction, resulting in him being repeatedly beaten, and then later, by leaving him wounded, shackled, and unprotected in the segregation pod, to be assaulted by the convicted D.O.C. inmate, Willis Caudill.

As for plaintiff's first claim, he has not alleged that he was attempting to exercise a constitutional right when the cell extraction occurred. Further, it has already been established *supra*

that the January 20, 2013 cell extraction was warranted, given plaintiff's prolonged disruptive behavior, thus plaintiff's naked conclusory allegations of reprisal in this regard must fail.[100]

Plaintiff's next contention that after being seen in medical on February 19, 2013, C.O. Vanorsdale escorted him back to the segregation unit and left him there, alone, shackled and handcuffed, with inmate Caudill, who C.O. Page had intentionally left out of his cell, free to assault plaintiff, in violation of policy. He contends that C.O. Athey and Page, who were working the A-Pod control tower that day, observed him being assaulted but failed to intervene, and Athey stated over the intercom to Vanorsdale afterward "man did you see that" and laughed.

Defendants' first dispositive motion contends that the investigation of the assault and Incident Reports prepared indicate that the involved officers were all new staff who were all determined to need counseling about procedure. Nevertheless, they argue, despite the officers' failure to comply with procedure, they acted promptly to address the situation, "thus meeting their constitutional duties to the Plaintiff despite the minor shortcomings in procedure."[101]

A careful review of the record, including the WVRJA Incident Reports of the February 19, 2013 assault reveals that consistent with the defendants' version of the event, the assault by inmate Caudill appears to have been a result of staff inadvertence, not retaliation.[102] Moreover, there is no merit to plaintiff's claim that Vanorsdale led him in, shackled and restrained, and abandoned him by leaving him alone. To the contrary, it is apparent that Caudill had been let out of his cell for his daily hygiene,[103] not to ambush plaintiff, who was being returned to the unit at that time. The report of Admin. Sgt. Donald Rowland, who investigated the incident, attached to defendants' first dispositive

---

[100] Adams v. Rice, 40 F.3d at 75.

[101] Dkt.# 58-1 at 14.

[102] Dkt.# 31-9 at 2.

[103] Dkt.# 31-9 at 4.

motion indicates that C.O. Vanorsdale failed to visually check to ensure all inmates were locked down before bringing a shackled inmate onto the unit and should have taken plaintiff into his lockdown cell to unshackle him, instead of beginning that process in the day hall. However, Rowland did note that that Vanorsdale "did get the inmate out of the section as soon as he observe . . . Caudill confronting . . . [him].[104] Also contrary to plaintiff's claim that Caudill's attack caused him to bleed from his left ear,[105] the Incident Report completed by the nurse Tina Adams LPN, who examined him afterwards, reveals that plaintiff's only complaint was a burning sensation in his left ear. His ear showed "no signs of obvious trauma"[106] and he was given a one-time dose of Tylenol and advised to report any worsening symptoms to staff.[107]

Plaintiff has not established that the assault by inmate Caudill was directly motivated by the defendants' desire to retaliate against him. Further, he fails to produce a chronology of events from which retaliation could be plausibly inferred. See Woods, 60 F.3d at 1166. Accordingly, this claim, as well, fails to state a retaliation claim upon which relief can be granted.

## H. Conditions of Confinement

Plaintiff alleges that both before and after the January 20, 2013 incident, while he was housed in Unit A-7, cell 5, "which at the time was a segregation unit[,]"[108] he was denied basic hygiene, including showers, exercise, and access to a telephone for either "several days"[109] or "over a week"[110]

---

[104] Dkt.# 31-9 at 2.

[105] Dkt.# 45-1, ¶64 at 5.

[106] Photographs taken at the time confirm this; there is no blood nor any cotton in the plaintiff's ear, and no visible mark on his face or head. See Dkt.# 31-9 at 9 – 11.

[107] Dkt.# 31-9 at 6.

[108] Dkt.# 45-1, ¶2 at 1.

[109] Dkt.# 45-1 at 1.

[110] Dkt.# 45 at 8.

Defendants' dispositive motion filed in response to the amended complaint disputes plaintiff's claims regarding his hygiene, exercise, and phone access.[111] They attach a sworn Affidavit in Support of Motion for Summary Judgment by Captain Gene Bittinger, stating that ERJ inmates in the administrative segregation unit are entitled to one hour each of hygiene and outdoor recreation every day, and that during their hygiene hour, they are free to use the phone to call their attorneys.[112] In support of this, they attach a copy of the Pod Checklists for January 17 – 13, 2013, showing that in the six day period encompassing the January 20, 2013 cell extraction, plaintiff received his allotted time for hygiene on January 18, 19, 22, and 23. Further, plaintiff (and all other inmates assigned to Pod A) refused recreation on January 18, 19, 20, 21; only one Pod A inmate opted for outdoor recreation on January 22, and two, including the plaintiff, took it on January 23, 2013.[113]

Plaintiff's <u>Roseboro</u> response fails to respond with any specificity to defendants' argument; he merely restates a general allegation that he was deprived of "basic human needs."[114]

42 U.S.C. §1983 provides as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

---

[111] Dkt.# 58-1 at 18.

[112] Dkt.# 58-2.

[113] Dkt.# 58-3.

[114] Dkt.# 73 at 2.

Therefore, in order to state a claim under 42 U.S.C. §1983, the plaintiff must demonstrate that a person acting under color of state law deprived him of the rights guaranteed by the Constitution or federal laws. Rendall-Baker v. Kohn, 547 U.S. 830, 838 (1982).

Conditions of confinement for those who have been convicted of crimes are evaluated under the Eighth Amendment. The United States Supreme Court set forth the general framework under which such claims are to be decided in Rhodes v. Chapman, 452 U.S. 337 (1981). "Conditions must not involve the wanton and unnecessary infliction of pain, nor may they be grossly disproportionate to the severity of the crime warranting imprisonment." Id. at 347. Accordingly, under the Eighth Amendment, sentenced prisoners are entitled to "adequate food, clothing, shelter, sanitation, medical care and personal safety." Wolfish v. Levi, 753 F.2d 118, 125 (2nd Cir. 1978), *rev'd on other grounds*, Bell v. Wolfish, 441 U.S. 520 (1994) (Eighth Amendment imposes certain duties upon prison officials to "ensure that inmates receive adequate food, clothing, shelter and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'"), *quoting* Hudson v. Palmer, 468 U.S. 517, 526-27 (1984).

Considered under this standard, even in the light most favorable to the plaintiff, even if his unfounded allegations regarding lack of daily hygiene for either several days or for over a week had support in the record, given that he alleges no injury or harm as a result, they are insufficient to give rise to a genuine issue of fact as to whether a claim of a constitutional magnitude has been presented. Clearly, as regrettable and unfortunate as it might be to be deprived the opportunity to bathe, even for three days to a week, such denial does not, by itself, rise to the level of a constitutional violation.[115]

---

[115] See generally, Bradley v. Puckett, 157 F.3d 1022, 1026 (5th Cir. 1998) (holding that denial of disabled prisoner proper facilities to shower for over two months stated claim for cruel and unusual punishment); Clayton v. Morris, No. 90 C 2718, 1994 WL 118186, *6 (N.D. Ill. Mar. 28, 1994) ("The denial of shower privileges over a prolonged period may be actionable if the inmate can allege a specific physical harm that results."); Martin v. Lane, 766 F. Supp. 641, 648 (N.D. Ill.1991) (same); see also Carver v. Bunch, 946 F.2d 451, 452 (6th Cir. 1991) ("The Eighth Amendment prohibits deliberate indifference to needs of prisoners, including the basic elements of hygiene."); Howard v. Adkison, 887 F.2d 134, 137 (8th Cir. 1989) ("[I]nmates are entitled to reasonably adequate sanitation, personal hygiene, and laundry privileges, particularly over a lengthy course of time."); McCoy v. Chesney, No. CIV.

Here, however, it is apparent from the record that plaintiff only missed the opportunity to shower for two consecutive days, January 20 and 21, 2013; moreover, it appears that he refused the opportunity when it was offered on one of those days.

With regard to lack of recreation, an inmate must show specific harm resulting from the deprivation and a complete denial for an extended period of time. *Compare* Mitchell v. Rice, 954 F.2d 187, 192 (4th Cir. 1992)(seven months without out-of-cell exercise violated constitutional standards of decency), and Knight v. Armontrout, 878 F.2d 1093, 10-95-96 (8th Cir. 1989)(thirteen days without recreation does not rise to Eighth Amendment violation).

Again, here, the plaintiff's claims of having been denied out-of-cell recreation for a period lasting either three to four days to "over a week" lacks any support in the record. To the contrary, it is apparent that plaintiff refused the opportunity for outdoor exercise January 18th – 22[nd.], 2013. Nonetheless, even if he had been denied the opportunity for outdoor exercise for over a week, because he makes no allegation that he suffered any harm, let alone a specific harm as a result, his claim would fail regardless.

Likewise, plaintiff's claim that he was denied access to the telephone, and therefore, access to his attorney for several days to "over a week" must fail as well. The plaintiff alleges no harm as a result of any alleged denial. Moreover, again, the record does not support plaintiff's claim, given that he could have used the phone during any of the one-hour hygiene hours afforded to him on any of the four out of six days during the relevant time period. Accordingly, the undersigned finds that this claim, as well as all of plaintiff's conditions of confinement claims against the defendants fails to state an Eighth Amendment claim.

## V. Recommendation

---

A. 95-2552, 1996 WL 119990, *5 (E.D. Pa. March 15, 1996) (Reed, J.) (holding that denial of personal hygiene items for three months constituted objectively serious deprivation).

For the reasons set forth, the undersigned recommends that the Defendants' Motions to Dismiss and for Summary Judgment (Dkt.# 31 and 58) be **GRANTED in part** and **DENIED in part.** Specifically, the undersigned recommends that the defendants Grona, Wolfe, Miller and Simmons be **ORDERED** to answer the Eighth Amendment Claim for the use of excessive force in the cell extraction, and that all of the named defendants be **ORDERED** to answer plaintiff's Eighth Amendment claim for deliberate indifference arising out of the 9 ½ hour delay in providing medical treatment after the January 20, 2013 assault. Further, all of plaintiff's other claims, with the exception of his claim for deliberate indifference on the part of ERJ's unnamed medical staff to provide any further care to his incised/packed right arm wound after the February 19, 2013 procedure, be **DISMSSED with prejudice for failure to state a claim upon which relief can be granted**. The undersigned recommends that plaintiff's claim for deliberate indifference on the part of ERJ's unnamed medical staff to provide any further care to his incised/packed right arm wound after the February 19, 2013 procedure be **DISMISSED without prejudice at this time, for failure to name a proper defendant.** Plaintiff should be afforded an extension of time in which to identify the names of the ERJ medical staff implicated in this claim, to permit him to move to amend his complaint again to include them.

**Within fourteen days (14)** after being served with a copy of this Recommendation with the Clerk of the Court, **or by July 14, 2015,** any party may file written objections identifying the portions of the Recommendation to which objections are made, and the basis for such objections. A copy of such objections should also be submitted to the United States District Judge. **Failure to timely file objections to the Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Recommendation**. 28 U.S.C. §636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk is directed to send a copy of this report and recommendation, via certified mail, return receipt requested, to the *pro se* Plaintiff at his last known address as reflected on the docket sheet, and electronically to any counsel of record, as applicable.

DATED: June 30, 2015

/s/ James E. Seibert
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE